MARC J. FAGEL (Cal. Bar No. 154425)
CARY S. ROBNETT (Cal. Bar No. 160585)
ROBERT S. LEACH (Cal. Bar No. 196191)
  leachr@sec.gov
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

MAXIM INTEGRATED PRODUCTS, INC. and
JOHN F. GIFFORD,

Defendants.

Case No. CV 07 6121

COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1. From at least 2000 through 2005, Maxim Integrated Products, Inc. ("Maxim" or the "Company"), a Sunnyvale, California semiconductor company, engaged in a scheme to illegally backdate stock options granted to Maxim employees and directors, concealing millions of dollars in expenses from investors and significantly overstating the Company's income. Defendant John F. Gifford, Maxim's former Chief Executive Officer, was aware of instances of backdating, and should have known that the Company did not properly account for or accurately disclose its resulting stock

1

SEC v. MAXIM INTEGRATED PRODUCTS, INC., et al.
COMPLAINT

1 | option compensation expenses.

2. Under well-settled accounting principles in effect during the relevant period, Maxim did not need to record an expense for options granted to employees with an exercise price equal to the current market price ("at-the-money"), while the Company was required to record an expense in its financial statements for any options granted with an exercise price below the current market price ("in-the-money"). In order to provide Maxim's employees and outside directors with valuable "in-the-money" options without recording an expense, Maxim routinely backdated stock options to dates corresponding to historical lows in Maxim's stock price, and falsified records to make it appear as though the options were granted "at-the-money." For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal year 2004, Maxim granted options to current employees with an exercise price equal to the lowest price of the quarter. Maxim then fraudulently failed to record compensation expenses for those options, thus overstating its income by millions of dollars and falsely representing in certain filings that it had incurred no expense for option grants.

3. Gifford several times authorized the granting of options on purported dates that had been selected with hindsight, which resulted in the issuance of undisclosed "in-the-money" options to Maxim employees and directors. Gifford was aware there were accounting implications for granting "in-the-money" options. He instructed other Maxim executives to record compensation expenses if they were material and/or consult with Maxim's outside auditors. Gifford should have known that the Company was failing to report expenses for these "in-the-money" stock options and was falsely reporting that it only granted options at fair market value.

4. The Commission seeks an order enjoining Maxim and Gifford from future violations of the securities laws, requiring Gifford to pay disgorgement with prejudgment interest, requiring Gifford to pay a civil monetary penalty, and providing other appropriate relief.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

5. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

6. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue is proper in this district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Maxim's principal place of business is in the Northern District of California. Gifford resides in the Northern District of California. Acts or transactions constituting violations of the federal securities laws occurred in this district.

8. Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places in this district, in Santa Clara County.

## DEFENDANTS

9. Maxim is a Sunnyvale, California corporation that makes integrated circuits. At all relevant times, Maxim's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market under the symbol "MXIM." At all times relevant to this action, Maxim used a fiscal year that ended on the last Saturday of June.

10. John F. Gifford, age 67, resides in Menlo Park, California. Gifford served as Maxim's President, Chief Executive Officer, and Chairman of the Board from April 1983 through December 2006.

## FACTUAL ALLEGATIONS

**A. Maxim Used Stock Options Liberally To Recruit And Retain Employees.**

11. During the relevant period, Maxim regularly used employee stock options as a form of compensation to recruit, retain, and incentivize key employees. Maxim also used stock options to compensate members of its Board of Directors. Each option gave the grantee the right to buy Maxim common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-money" when granted if the trading price of Maxim common stock on the date of the grant exceeded the option's exercise price. The option was

"at-the-money" when granted if the trading price of Maxim's common stock on the date of the grant and the exercise price were the same.

12. Stock options were the most important part of Maxim's compensation mix. Maxim generally paid its officers and technical employees lower salaries than its peers; it competed against other companies for employees by offering the potential gains provided by stock options. Maxim's ability to recruit and retain the engineers who designed and produced its new products was closely tied to its stock option program. In addition, Maxim attributed its earnings growth and positive stockholder returns in part to its option practices. The Company repeatedly emphasized these facts in communications with its shareholders.

13. Maxim granted options to almost all new employees when they were hired. Maxim also granted employees additional options every year as part of their annual performance review. Because it granted so many options, Maxim had to ask shareholders to approve increases in the number of shares available for issuance under its primary stock option plan every year from 1999 through 2005.

14. Maxim's primary stock option plan authorized it to grant both "incentive" stock options and "non-qualified" stock options. Maxim's plan defined an incentive stock option as an option intended to qualify as an incentive stock option within the meaning of certain provisions of the Internal Revenue Code. Maxim's plan defined a "non-qualified" option as any option not intended to qualify as an incentive stock option.

**B. Maxim Told The Public It Granted Stock Options At Fair Market Value.**

15. From at least 2000 and continuing through June 30, 2004, Maxim's primary stock option plan prohibited it from granting incentive stock options with an exercise price less than the stock's fair market value on the date of grant. In other words, the plan did not allow incentive stock options to be granted "in-the-money."

16. During the same time period, Maxim's primary stock option plan allowed some flexibility in granting non-qualified stock options with an exercise price less than the stock's fair market value on the date of grant, but only subject to certain conditions not applicable here.

17.     Under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") and the accounting rules in effect from 1997 through 2005, issuers were required to record an expense on their financial statements for the "in-the-money" portion of any option grant. According to APB 25, that difference must be recorded as a compensation expense to be recognized over the vesting period of the option. Consequently, granting "in-the-money" options to employees could have a significant impact on the expenses and income (or loss) reported to the shareholders of a public company. APB 25 allowed companies, where the key terms of an option grant were known, to grant employee stock options without recording any compensation expense so long as the option exercise price was not below the stock's market price on the date of the grant.

18.     Maxim publicly reported, in its annual reports on Form 10-K for fiscal years 2000 through 2005, that the Company accounted for its employee stock options in accordance with APB 25. Additionally, during the relevant time period, Maxim represented that the Company generally granted options "at-the-money," not "in-the-money." Hence, in its annual reports for fiscal years 2000 through 2005, Maxim did not report any compensation expenses for stock options.

**C.     Maxim Backdated Employee And Director Option Grants.**

19.     Maxim's primary stock option plan provided that it was to be administered by the Board of Directors or a committee designated by the Board. The Board had the ability to select employees, directors, and consultants to whom options would be granted, to determine the number of shares to be covered by each option, and to determine the terms and conditions of any option granted under the plan.

20.     Maxim's Board delegated to Gifford the authority to grant stock options to non-officer employees as well as to outside directors. From at least 1999 and continuing through at least Maxim's 2004 fiscal year, Gifford approved all option grants made to non-officer employees and outside directors.

21.     Maxim repeatedly backdated option grants made to current employees, to newly hired employees, and to outside directors. These backdated grants reflected historically low prices of Maxim stock for the weeks prior to the date on which the price actually was selected. For ten consecutive quarters, from the second quarter of fiscal year 2002 to the fourth quarter of fiscal year

2004, Maxim granted options to current employees with an exercise price equal to the lowest price of the quarter. By backdating the option grants to make it falsely appear that "in-the-money" option grants had been "at-the-money" when granted, Maxim avoided reporting in its financial statements compensation expenses for the options.

### a. Maxim's Option Grants To Employees

22. During the relevant time period, Maxim granted options to current employees on a quarterly basis. Each quarter, Maxim's managers proposed to Gifford the number of options to be granted to employees whose annual performance reviews fell within that quarter. Gifford either approved, or first revised and then approved, the number of proposed options for each employee. Maxim's stock administration department accumulated the employee options approved by Gifford until it learned the grant date for those options.

23. Gifford approved the grant date and price for some options awarded to current employees. The grant date then was communicated to Maxim's stock administration department so that the grants could be recorded in Maxim's books and records.

24. A number of grant dates used for options awarded to Maxim's current employees were selected with hindsight. This allowed Maxim to select the lowest possible price for the options. No compensation expenses were recorded for the undisclosed "in-the-money" option grants to current employees.

25. During the relevant time period, Maxim also granted options to new hires on a quarterly basis. Similar to the current employee grants, Gifford approved the number of options to be granted to new hires. Maxim's stock administration department accumulated the options approved by Gifford until it learned the applicable grant date.

26. As with stock options awarded to current employees, grant dates used for options awarded to new hires were selected with hindsight. Maxim determined the grant dates by determining a date with a low stock price for the quarter after the date on which the employee was hired. No compensation expenses were recorded for the undisclosed "in-the-money" grants to new hires.

27.     In connection with certain grants to current employees and new hires, Gifford signed backdated memoranda (drafted by Maxim's Chief Financial Officer and, at times, other Maxim employees) indicating that he had selected the grant date on the dates indicated in the memoranda. One of the purposes of the grant approval memoranda was to serve as an audit trail and make it appear as though the options had been granted at the market price on the earlier date. Gifford signed these memoranda and similar documents without making any effort to confirm that they accurately reflected the actual date on which the selection of the grant date in fact had been made. These memoranda did not accurately reflect the dates on which decisions were made to grant options.

28.     With respect to at least four backdated option grants, Gifford in writing instructed Maxim's CFO to record compensation expenses. But no compensation expenses were recorded.

### b.     Examples Of Maxim's Backdated Employee Options

29.     Maxim purportedly granted approximately 2.7 million options to employees on June 30, 2003, with an exercise price equal to that day's closing stock price of $34.10. This was Maxim's lowest stock price of the quarter. In reality, the grant was not made until on or around August 26, 2003, when the stock was trading at $43.26. On or around August 22, 2003, Gifford asked Maxim's CFO: "What is the lowest price we can use for Q1 options?" The CFO responded: "The best price is the first day of the quarter – June 30, 2003. The price was $34.10 on that date." Gifford approved the grant using the June 30th price, but also instructed the CFO to record a compensation expense if it was material. Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

30.     In another example, Maxim purportedly granted 2.4 million options to certain employees on October 2, 2001, with an exercise price equal to that day's closing stock price of $33.40. This was Maxim's lowest stock price of the quarter. In reality, the grant was not made until on or around December 28, 2001, when the stock was trading at $54.61. On or around December 28, Maxim's CFO proposed to Gifford that Maxim use October 2 as the grant date for options awarded to certain current employees, and November 28 and December 24 for options awarded to certain new hires (depending on their hire date). Maxim used the dates suggested by its CFO to grant options.

Although the options were in-the-money when granted, Maxim failed to record compensation expenses for the options.

31. Additionally, Maxim purportedly granted 3.2 million options to existing employees on September 30, 2003, with an exercise price equal to that day's closing stock price of $39.39. This was Maxim's lowest stock price of the quarter. In reality, the grant was not made until significantly later in the quarter. Maxim's stock administration department did not learn about the grant date until on or about November 25, 2003, when Maxim's stock was trading at $51.47. Gifford later signed a memorandum (drafted by another Maxim employee) dated September 30, 2003, that stated: "I have granted options today for all existing employees for this quarter, and for new hires up through this date – the stock closed at $39.39." Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

32. Maxim purportedly granted options to new employees hired after February 28, 2002 on March 25, 2002, with an exercise price equal to the March 25th closing stock price of $51.81. In reality, these grants were not made until sometime in late April 2002, after the quarter had ended. On or about April 22, Maxim's CFO asked Gifford to sign a grant approval memorandum dated March 25, 2002, to "keep [Maxim's] documentation and records straight." Gifford signed the memorandum, which stated: "I want you to make sure that any new hire who started at Maxim between March 1, 2002 and today has their stock granted at today's closing price of $51.81." Maxim's stock administration department did not learn of the supposed March 25th grant date until on or about April 24, 2002.

      c. **Maxim's Option Grants To Outside Directors**

33. Maxim also backdated certain stock option grants to its outside directors. For example, Maxim purportedly granted the directors 36,000 options on October 1, 2001, at an exercise price equal to that day's closing stock price of $34.06. This grant was not actually made until on or around December 11, 2001, when Maxim's stock was trading at $57.90. In or around December 2001, Maxim's CFO proposed to Gifford a range of historical dates for the outside director grants. On or around December 11, Gifford approved using a grant date of October 1, 2001, but also in

writing instructed the CFO to record an expense if it was material. Gifford later signed meeting minutes stating that he held a meeting on October 1, 2001, and granted options at the fair market value on that date. Although the options were "in-the-money" when granted, Maxim failed to record compensation expenses for the options.

### d. Maxim Executives Understood The Implications Of Backdating

34. Gifford understood there were accounting implications for awarding "in-the-money" options. Indeed, Gifford told Maxim employees that Maxim's stock option program helped Maxim's bottom line because "an option granted at fair market value does not result in expense for profit & loss purposes, so profit is increased."

35. Maxim's CFO also understood the accounting implications of awarding "in-the-money" options. For example, he warned Gifford in writing that Maxim should record a compensation expense where it contemplated giving one employee a retroactively-priced option but noted that "for one person, we will just get it done."

36. Gifford instructed Maxim's CFO on several occasions to record a compensation expense for option grants, demonstrating familiarity with stock option accounting principles. In one handwritten note to the CFO, Gifford stated: "I would like to use [a price from eight weeks ago] for our employees but we will have to expense the difference if it is material."

### D. As A Result Of The Backdating, Maxim Publicly Reported False And Misleading Financial Information.

37. Maxim is a public company. Accordingly, it filed with the Commission annual reports on Form 10-K for the fiscal years ended June 24, 2000 (filed September 22, 2000), June 30, 2001 (filed September 24, 2001), June 29, 2002 (filed September 25, 2002), June 28, 2003 (filed September 22, 2003), June 26, 2004 (filed September 9, 2004), and June 25, 2005 (filed September 8, 2005) which included audited financial statements that were certified by the Company's outside auditors.

38. Both Gifford and Maxim's CFO reviewed Maxim's annual reports filed on Forms 10-K before they were filed with the Commission for its 2000 through 2005 fiscal years. In connection with Maxim's 2003, 2004, and 2005 annual reports, Gifford and Maxim's CFO signed certifications

stating that they had reviewed the annual reports and that the annual reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

39. In the notes to its audited financial statements, which were included in its annual reports for fiscal years 2000 through 2005, Maxim affirmatively stated that the Company accounted for its employee stock option plans in accordance with APB 25. Additionally, in its annual reports for fiscal years 2000 through 2003, Maxim stated that under the Company's stock option plans, options generally were granted at prices not less than the fair market value of the Company's common stock on the grant date. Maxim's annual reports for fiscal years 2004 and 2005 stated that options were granted at prices not less than the fair market value of the Company's common stock on the grant date. In its annual report for fiscal year 2004, Maxim stated affirmatively that it was not required to record compensation expenses in connection with stock option grants to employees. Maxim knew or was reckless in not knowing that these statements were false and misleading, because Maxim was aware it granted "in-the-money" options but concealed them through the use of backdating.

40. In its financial statements accompanying its annual reports, Maxim failed to record compensation expenses in connection with the backdated, "in-the-money" option grants. It was aware it granted "in-the-money" options and was aware it was required to record compensation expenses for these options, yet it failed to do so. Maxim materially understated its expenses and overstated its net income in the financial statements included in its annual reports by more than 10% for its fiscal years 2003 through 2005.

41. Maxim also filed with the Commission quarterly reports on Form 10-Q for the quarters ended September 28, 2002 (filed November 8, 2002), December 28, 2002 (filed February 11, 2003), March 29, 2003 (filed May 12, 2003), September 27, 2003 (filed November 6, 2003), December 27, 2003 (filed February 5, 2004), March 27, 2004 (filed May 6, 2004), September 25, 2004 (filed November 4, 2004), December 25, 2004 (filed February 3, 2004), and March 26, 2005 (filed May 5, 2005), which contained Maxim's quarterly financial statements. These financial statements were

materially false or misleading because Maxim failed to record in its quarterly financial statements compensation expenses associated with "in-the-money" options.

42. Both Gifford and Maxim's CFO reviewed the above Forms 10-Q before they were filed with the Commission. Additionally, for the quarters ended September 28, 2002, December 28, 2002, and March 29, 2003, they certified that the quarterly reports fairly presented Maxim's financial condition and results of operation. For the quarter ended September 27, 2003 through the quarter ended March 26, 2005, they certified that they had reviewed the quarterly reports and that they were not aware of any material misstatements of fact or omissions in those reports.

43. In addition, Maxim filed with the Commission current reports on Form 8-K on April 29, 2003, August 12, 2003, October 28, 2003, February 5, 2004, April 27, 2004, August 6, 2004, November 1, 2004, February 1, 2005, and May 3, 2005, each of which announced the Company's financial results for the prior quarter. These current reports contained materially false and misleading financial information because Maxim failed to record compensation expenses associated with undisclosed grants of "in-the-money" stock options.

44. Maxim's proxy statements (which were sent to its shareholders) also made materially false representations about Maxim's stock option grants. Gifford reviewed and edited Maxim's proxy statements before they were filed with the Commission. In Maxim's proxy statement filed August 19, 2004, Gifford signed an introductory letter discussing Maxim's request that its shareholders approve an additional 13 million shares for its stock option plan. In urging shareholders to approve the additional shares, the letter stated that Maxim's stock option plan was "managed for the best interests of the stockholders," in part because "all of Maxim's options are granted at fair market value." These statements were repeated elsewhere in the proxy statement.

45. In Maxim's proxy statement filed October 7, 2005, Gifford signed an introductory letter discussing Maxim's request that its shareholders authorize an additional 10.8 million shares for its option plan. In urging shareholders to approve the additional shares, the letter similarly stated that Maxim's stock option plan was "managed for the best interests of the stockholders" in part because

"Maxim's stock options have always been granted with an exercise price equal to the fair market value of Maxim's stock." These statements were repeated elsewhere in the proxy statement.

46. Maxim also sold securities pursuant to offering documents, including registration statements on Forms S-8, which incorporated Maxim's false and misleading financial statements. Those Forms S-8 were filed with the Commission on April 12, 2001 (incorporating Maxim's annual report on Form 10-K for the year ended June 24, 2000, Maxim's quarterly reports on Forms 10-Q for the quarters ended September 23, 2000 and December 30, 2000, and Maxim's current reports on Forms 8-K filed on January 30, 2001 and April 11, 2001); February 13, 2003 (incorporating Maxim's annual report on Form 10-K for the year ended June 29, 2002 and Maxim's quarterly reports on Forms 10-Q for the quarters ended September 28, 2002 and December 28, 2002); and April 24, 2005 (incorporating Maxim's annual report on Form 10-K for the year ended June 26, 2004, Maxim's quarterly reports on Forms 10-Q for the quarterly periods ended September 25, 2004 and December 25, 2004, Maxim's current report on Form 8-K filed December 20, 2004, and Maxim's proxy statements filed August 19, 2004 and October 18, 2004). Both Gifford and Maxim's CFO signed these Form S-8s.

47. Gifford was aware that Maxim used hindsight to select grant dates for some options. He also was aware there were accounting implications for granting in-the-money options. In connection with at least four backdated option grants, he instructed Maxim executives to record compensation expenses for "in-the-money" options. Based on these actions, Gifford should have known that Maxim did not properly account for its resulting stock option compensation expenses in its financial statements which were included in its Forms 10-K, Forms 10-Q, Forms 8-K, and Forms S-8. Gifford also should have known that Maxim did not accurately describe its stock option grants in its proxy statements and annual reports on Forms 10-K.

48. Maxim was aware that it used hindsight to select grant dates for options. Maxim also was aware of the accounting implications of granting in-the-money options. Maxim knew, or was reckless in not knowing, that its annual reports on Forms 10-K, quarterly reports on Form 10-Q,

Forms 8-K, Forms S-8, and proxy statements contained false and misleading statements and omissions regarding Maxim's stock option grants.

49. Maxim provided documentation, which failed to disclose the true grant dates for options to employees and outside directors, to the Company's external auditors in connection with audits of Maxim's financial statements.

50. In June 2006, the Special Committee of Maxim's Board began to investigate the Company's historical option granting practices. As a result of the Special Committee investigation, Maxim in January 2007 announced that it believed the accounting adjustments needed to properly record expenses for options granted to employees and outside directors were material and that it expected to restate its financial statements for Maxim's fiscal years 2000 through 2005 and the related interim periods through March 25, 2006. Maxim also warned that its financial statements, related reports, and all earnings press releases and similar communications relating to those periods should not be relied upon. Maxim further announced that the Special Committee found no evidence that the outside directors engaged in any wrongdoing with respect to Maxim's stock option grants.

51. During the relevant period, Gifford received annual bonuses tied in part to the Company's achievements and reported profitability.

### FIRST CLAIM FOR RELIEF
(Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder by Maxim)

52. The Commission realleges and incorporates by reference paragraphs 1 through 51.

53. By engaging in the conduct described above, Maxim, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

54. By reason of the foregoing, Maxim has violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
*(Violations of Securities Act Section 17(a)(1) by Maxim)*

55. The Commission realleges and incorporates by reference Paragraphs 1 through 51.

56. By engaging in the conduct described above, Maxim, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

57. By reason of the foregoing, Maxim violated and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
*(Violations of Securities Act Section 17(a)(2) by Maxim)*

58. The Commission realleges and incorporates by reference Paragraphs 1 through 51.

59. By engaging in the conduct described above, Maxim, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60. By reason of the foregoing, Maxim has violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM FOR RELIEF
*(Violations of Section 17(a)(3) of the Securities Act by Defendants)*

61. The Commission realleges and incorporates by this reference Paragraphs 1 through 51.

62. By engaging in the acts and conduct alleged above, Maxim and Gifford, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

63. By reason of the foregoing, Maxim and Gifford have violated and, unless restrained and enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**FIFTH CLAIM FOR RELIEF**
*(False Periodic Reports – Violations of and Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder by Defendants)*

64. The Commission realleges and incorporates by reference Paragraphs 1 through 51.

65. Based on the conduct alleged above, Maxim violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission accurate periodic reports, including annual, current, and quarterly reports. Unless restrained and enjoined, Maxim will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

66. By engaging in the acts and conduct alleged above, Gifford knowingly provided substantial assistance to Maxim's filing of materially false and misleading reports with the Commission.

67. By reason of the foregoing, Gifford aided and abetted Maxim's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder. Unless restrained and enjoined, Gifford will continue to aid and abet such violations.

**SIXTH CLAIM FOR RELIEF**
*(False Books and Records – Violations of and Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A) by Defendants)*

68. The Commission realleges and incorporates by reference Paragraphs 1 through 51.

69. Based on the conduct alleged above, Maxim violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Unless restrained and enjoined, Maxim will continue to violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

70. By engaging in the acts and conduct alleged above, Gifford knowingly provided substantial assistance to Maxim's failure to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

71. By reason of the foregoing, Gifford has aided and abetted violations by Maxim of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Unless restrained and enjoined, Gifford will continue to aid and abet such violations.

### SEVENTH CLAIM FOR RELIEF
*(Inadequate Internal Accounting Controls—Violations of and Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act by Defendants)*

72. The Commission realleges and incorporates by this reference Paragraphs 1 through 51.

73. Based on the conduct alleged above, Maxim violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to devise and maintain a sufficient system of internal accounting controls. Unless restrained and enjoined, Maxim will continue to violate Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

74. By engaging in the acts and conduct alleged above, Gifford knowingly provided substantial assistance to Maxim's failure to devise and maintain a sufficient system of internal accounting controls.

75. By reason of the foregoing, Gifford aided and abetted violations by Maxim of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]. Unless restrained and enjoined, Gifford will continue to aid and abet such violations.

### EIGHTH CLAIM FOR RELIEF
*(False Proxy Statements—Violations*

*of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder by Defendants)*

76. The Commission realleges and incorporates by this reference Paragraphs 1 through 51.

77. Based on the conduct alleged above, Maxim and Gifford violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting, or other communication, written or oral, that contains a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

78. By reason of the foregoing, Maxim and Gifford violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder. Unless restrained and enjoined, Maxim and Gifford will continue to violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin Maxim from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)], and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9] thereunder; and

Permanently enjoin Gifford from directly or indirectly violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] and Section 14(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

II.

Order Gifford to pay disgorgement, including prejudgment interest.

III.

Order Gifford to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

V.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: December 4, 2007          Respectfully Submitted,

_____
Erin E. Schneider
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION